## United States District Court
### District of Massachusetts

```
_____
                               )
UNITED STATES OF AMERICA; the  )
STATES OF CALIFORNIA, DELAWARE,  )
FLORIDA, GEORGIA, HAWAII,        )
ILLINOIS, INDIANA, LOUISIANA,    )    Civil Action No.
MASSACHUSETTS, MICHIGAN,         )    08-11775-NMG
MONTANA, NEVADA, NEW HAMPSHIRE,  )
NEW JERSEY, NEW MEXICO, NEW      )
YORK, OKLAHOMA, RHODE ISLAND,    )
TENNESSEE, TEXAS, VIRGINIA and   )
WISCONSIN; and THE DISTRICT OF   )
COLUMBIA,                        )
                                 )
ex rel. ARLENE TESSITORE,        )
          Plaintiffs,            )
                                 )
     v.                          )
                                 )
INFOMEDICS, INC.,                )
GLAXOSMITHKLINE, PLC and         )
GLAXOSMITHKLINE, LLC,            )
          Defendants.            )
_____  )
```

### MEMORANDUM & ORDER

**GORTON, J.**

Arlene Tessitore ("Relator") brings this qui tam action on behalf of the United States, 22 individual states and the District of Columbia against defendants Infomedics, Inc. ("Infomedics"), Glaxosmithkline PLC and Glaxosmithkline LLC (together, "GSK") under the federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1), (a)(2) and (a)(3), and various state FCAs.

The suit arises from the defendants' marketing of the drug paroxetine hydrochloride, sold in the United States under the

trade names Paxil and Paxil CR ("Paxil").  Before the Court are two motions to dismiss: one of GSK and one of Infomedics.

## I.   **Background**

GSK is one of the world's largest pharmaceutical manufacturers.  Among its arsenal of prescription drug products is Paxil, an antidepressant used to treat several depression and anxiety-related disorders.  In the late-1990s, GSK hired Infomedics, a pharmaceutical marketing company, to assist in the marketing and promoting of Paxil.  Relator, a former employee of Infomedics between late 1999 and early 2002, was involved in those marketing efforts.

Paxil was first approved by the United States Food and Drug Administration ("FDA") in 1992 for treatment of Major Depressive Disorder and has subsequently been FDA-approved as treatment for several other indications.  Most germane to the instant action, Paxil was approved by the FDA as treatment for Social Anxiety Disorder ("SAD") in May, 1999.  Paxil was the first drug to be approved for such treatment.

Prior to obtaining FDA approval, GSK allegedly launched The Initiative for Social Anxiety Assessment and Care Program ("ISAAC program").  The ISAAC program purported to be a study into social phobias but Relator contends it was, in fact, a marketing mechanism to encourage physicians, through monetary incentives, to prescribe Paxil as treatment for SAD.  GSK hired Infomedics to

administer the ISAAC program and serve as a general intermediary with consumers.

Relator contends that, pursuant to the ISAAC program, GSK hosted a series of continuing education classes for physicians in which Paxil was promoted as treatment for SAD and attending physicians were provided with GSK-devised diagnostic tools. The physicians would subsequently use those diagnostic tools to screen their patients for social anxiety symptoms. Physicians would then instruct any positively screened patients to participate in the study of social phobias by calling a toll-free number and answering symptom-related questions. For each patient who called to complete the survey, physicians "received compensation" paid by GSK, although Relator does not specify the nature of that compensation.

According to the complaint, the ISAAC program dispensed with the continuing education classes after the FDA approved Paxil as treatment for SAD, and GSK sales representatives began directly recruiting physicians. Thereafter, for each patient who completed the telephonic survey, physicians were paid $100, with a maximum of up to $1,000 per physician. The Relator estimates that 1) 1,500 physicians participated in ISAAC (because it was GSK's "goal" to enroll that number), 2) more than 12,000 patients participated in the program and 3) the ISAAC program generated $150 million in increased Paxil sales for GSK.

Also after obtaining FDA approval, GSK allegedly advertised Paxil as treatment for SAD on television and in print. Included within the advertisements were "800" telephone numbers ("Paxil 800 numbers") for consumers to call and request more information about Paxil. Relator contends that the Paxil 800 numbers included automated promotional statements about Paxil, provided SAD screening tests for consumers to self-diagnose and allowed consumers to leave their contacts in order to receive labeling information, but did not, contrary to recommended industry practice, provide consumers with an alternate phone number or method to report adverse experiences associated with their Paxil use.

According to the complaint, Infomedics hosted the Paxil 800 numbers and received the calls from consumers. A voice message left by a consumer seeking further information was recorded into a database and later transcribed by InfoMedics call center operators. That database generated mailing labels that Infomedics used to send callers Paxil brochures and drug inserts.

Relator states that she acted as a Call Center Supervisor and Business Analyst for the Paxil Marketing Program between late 1999 and early 2002. She alleges that, during that period of time, consumers would leave messages reporting serious adverse experiences with Paxil, including, but not limited to, birth defects and suicidal behavior. Because certain calls were

shocking and disturbing, call center representatives would often play the messages on speaker phone for other call center representatives to hear.

Nonetheless, the call center representatives were allegedly instructed by their supervisors at Infomedics not to transcribe or forward the adverse event calls to GSK. When Relator herself twice asked supervisors, once verbally and once by e-mail, whether the serious adverse event calls should be transcribed and reported to GSK, she was informed that they should not be and that GSK did not want to receive any such reports.

Relator states that the Paxil 800 numbers generated over 100,000 calls into the InfoMedics call center. She further estimates that 7,000 of those calls reported adverse events. Her latter estimate is based upon a statistic from the Consumer HealthCare Product Association that, on average, 7% of calls received into a company's 800 number relate to adverse drug reactions. Relator contends that Infomedics never transcribed or forwarded those adverse events to GSK and that, in turn, the adverse events were never reported to the FDA.

According to Relator, the concealment of adverse events was not limited to Paxil's marketing for SAD but also occurred with respect to other Paxil marketing campaigns administered by Infomedics. Specifically, she states that she was an analyst of Infomedics' "Brand Accelerator Program" which allegedly allowed

Infomedics' clients to use positive feedback from patient surveys while intentionally avoiding the collection and reporting of adverse events. GSK launched a Paxil Brand Accelerator program in mid-2002, after Relator had left Infomedics. Relator states, "upon information and belief", that the Paxil Brand Accelerator program prohibited the reporting and recording of adverse events.

Eventually, Relator contends, the FDA required GSK to include warnings regarding a risk of suicidal ideation and birth defects associated with Paxil. Specifically, she states that in June, 2003, the FDA issued a public safety alert regarding a possible link between Paxil use and increased suicidal ideation in children and adolescents. After confirming the risk, the FDA purportedly required GSK to place a black box safety warning on its Paxil label and then, in 2006, to amend that label to include young adults. Meanwhile, Relator states, in December, 2005, the FDA released a public health advisory reporting that it was increasing Paxil's "pregnancy category risk profile".

Relator's qui tam action alleges that GSK knowingly caused false claims to be submitted to the government by 1) paying illegal kickbacks to physicians participating in the ISAAC program and 2) misrepresenting to the FDA its intent to comply with its obligation to report adverse events and colluding with Infomedics to conceal adverse events reported by consumers to the Paxil 800 numbers.

The government has chosen not to exercise its statutory prerogative to intervene in this case. It has, however, submitted a "Statement in Interest" 1) to contest certain legal positions taken by the defendants, even though it does not believe the Relator's complaint is sufficient to support her allegation that illegal kickbacks and/or reporting violations occurred, and 2) to state that any dismissal of the Relator's complaint should be without prejudice to the government.

## II.  **Procedural History**

The Relator filed her <u>qui tam</u> action in October, 2008. After a lengthy investigation into her claims, the government filed notice of its election not to intervene in February, 2010. The case was unsealed in June, 2010.

The defendants filed motions to dismiss in February, 2011. In response, Relator amended her complaint in March, 2011. The following month, the defendants renewed their motions to dismiss and Relator opposed the motions. In June, 2011, the parties requested, and the Court allowed, a stay in the briefing schedule pending the outcome of two cases then on appeal to the United States Court of Appeals for the First Circuit which would purportedly impact the Relator's claims and the motions to dismiss. After disposition of those appellate cases, the Relator filed a supplemental opposition to the motions to dismiss in August, 2011 to which defendants filed a response.

In October, 2011, the government submitted its "Statement in Interest." Relator responded with a "Statement of Clarification" in which she contends that the government has misconstrued the legal theory of her claim. With leave, the defendants each replied to Relator's statement of clarification.

## III. <u>Analysis</u>

Defendants assert that Relator's complaint should be dismissed with prejudice because it 1) fails to meet the pleading standard for fraud under Fed. R. Civ. P. 9(b), 2) fails to state a claim under the FCA for purposes of Fed. R. Civ. P. 12(b)(6) and 3) is barred by the FCA's first-to-file and public disclosure rules, 31 U.S.C. § 3730(b)(5) and (e)(4)(A). For the reasons stated below, the Court agrees that Relator's claim fails to meet the pleading standard for fraud and will order the complaint dismissed.

### A. Motion to Dismiss Standard

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." <u>Bell Atl. Corp.</u> v. <u>Twombly</u>, 550 U.S. 544, 570 (2007). In considering the merits of a motion to dismiss, the Court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken. <u>Nollet</u> v. <u>Justices of the Trial Court of</u>

Mass., 83 F. Supp. 2d 204, 208 (D. Mass. 2000), aff'd, 248 F.3d 1127 (1st Cir. 2000). Furthermore, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Langadinos v. Am. Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000). If the facts in the complaint are sufficient to state a cause of action, a motion to dismiss the complaint must be denied. See Nollet, 83 F. Supp. 2d at 208.

Although a court must accept as true all of the factual allegations contained in a complaint, that doctrine is not applicable to legal conclusions. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). Threadbare recitals of the legal elements which are supported by mere conclusory statements do not suffice to state a cause of action. Id. Accordingly, a complaint does not state a claim for relief where the well-pled facts fail to warrant an inference of anything more than the mere possibility of misconduct. Id. at 1950.

**B.  Relevant Statutory Provisions**

FCA liability arises when a "provider knowingly asks the Government to pay amounts it does not owe." United States ex rel. Clausen v. Lab. Corp. of Am., 290 F.3d 1301, 1311 (11th Cir. 2002); see also Mikes v. Straus, 274 F.3d 687, 695 (2nd Cir. 2001) ("[A]n improper claim is aimed at extracting money the government otherwise would not have paid."). The FCA extends to

-9-

"all fraudulent attempts to cause the Government to pay out sums of money."  Harrison v. Westinghouse Savannah River, 176 F.3d 776, 788 (4th Cir. 1999).

The qui tam provisions of the FCA supplement federal law enforcement resources by allowing whistleblowers (known as relators) to bring certain fraud claims on behalf of the government.  United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 579 F.3d 13, 16 (1st Cir. 2009).  In return, a relator is entitled to a portion of the proceeds from the suit, whether or not the government elects to intervene as an active participant in the action.  Id.

Here, Relator's qui tam complaint alleges violations of 31 U.S.C. § 3729(a)(1), (a)(2) and (a)(3) (current version at 31 U.S.C. § 3729(a)(1)(A), (B) and (C), respectively).  Subsection (a)(1) imposes liability on any person who knowingly presents to the government, or causes to be presented, a false or fraudulent claim for payment or approval.  Subsection (a)(2) imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  Subsection (a)(3) imposes liability on "any person who conspires to defraud the Government by getting a false or fraudulent claim allowed or paid."

A person acts "knowingly" if he or she 1) has actual

knowledge of the information, 2) acts in deliberate ignorance of the truth or falsity of the information, or 3) acts in reckless disregard of the truth or falsity of the information.  <u>Id.</u> § 3729(b).  To act knowingly requires "no proof of specific intent to defraud." <u>Id.</u>

### C.    **Failure to Plead Fraud with Particularity**

Because Relator's FCA claims sound in fraud, they must be pled with the specificity required by Fed. R. Civ. P. 9(b). <u>United States ex rel. Gagne</u> v. <u>City of Worcester</u>, 565 F.3d 40, 45 (1st Cir. 2009).  At a minimum, then, the complaint must specify the "time, place, and content of an alleged false representation." <u>Id.</u> at 45 (internal quotation omitted). In other words, it must set forth "the who, what, where, when, and how of the alleged fraud." <u>United States ex rel. Walsh</u> v. <u>Eastman Kodak Co.</u>, 98 F. Supp. 2d 141, 147 (D. Mass. 2000) (internal quotation omitted).  "Conclusory allegations and references to 'plans and schemes' are not sufficient." <u>United States ex rel. Rost</u> v. <u>Pfizer, Inc.</u>, 207 F.3d 720, 731 (1st Cir. 2007).  Rule 9(b) may, however, be satisfied where "some questions remain unanswered" as long as "the complaint as a whole is sufficiently particular to pass muster under the FCA." <u>Gagne</u>, 565 F.3d at 45.

Because "the heightened pleading standard of Rule 9(b) generally applies to state law fraud claims brought in federal

court", the Court will apply the rule to all of Relator's claims. Rost, 507 F.3d at 731 n.8.

### 1. GSK's Kickbacks (Count IV)

Relator alleges that GSK paid illegal "kickbacks" to physicians participating in the ISAAC program and thereby caused those physicians to file false or fraudulent reimbursement claims with various government healthcare programs in violation of 31 U.S.C. § 3729(a)(1). The claims were false, Relator contends, because they were tainted by kickbacks and thus were per se ineligible for reimbursement. See, e.g., United States ex rel. Westmoreland v. Amgen, Inc., No. 06-10972, 2011 WL 4342721, at *12 (D. Mass. 2011) ("[C]ourts, without exception, agree that compliance with the Anti-Kickback Statute is a precondition of Medicare payment, such that liability under the False Claims Act can be predicated on a violation of the Anti-Kickback Statute.") (citing numerous cases in support).

"The FCA ... attaches liability not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment." Rost, 507 F.3d at 731-32 (citing United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 225 (1st Cir. 2004)). Because a claim under subsection (a)(1) requires proof that a false or fraudulent claim was "presented" to the government, a complaint must "provide details that identify particular false claims for payment that were

-12-

submitted to the government." Gagne, 565 F.3d at 46 n.7 (quoting Karvelas, 360 F.3d at 232).

A relator's burden under Fed. R. Civ. P. 9(b) to provide details of actual false claims varies according to whether the defendant is alleged to have itself submitted false claims or is instead alleged to have induced a third party to do so (e.g., through kickbacks). United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 579 F.3d 13, 29 (1st Cir. 2009) (citing Rost, 507 F.3d at 733). In the latter context, which is implicated here, a relator can satisfy Fed. R. Civ. P. 9(b) by providing details which identify the particular false claims for payment that were submitted to the government, Karvelas, 360 F.3d at 232, or, at a minimum, by providing "factual or statistical evidence to strengthen the inference of fraud beyond possibility", even where details as to each false claim are not offered. Duxbury, 579 F.3d at 29 (quoting Rost, 507 F.3d at 733).

Even presuming that payments made pursuant to the ISAAC program constituted illegal kickbacks, Relator's complaint falls short of the particularity requirement because it suggests only that fraud was possible. The ISAAC program involved payment to physicians who screened a patient for SAD and convinced the patient to complete GSK's telephonic survey. While plaintiff avers that the participating physicians ultimately prescribed

Paxil to those patients and submitted false claims for reimbursement, she has provided no factual allegations, or reliable statistical evidence, to support an inference that such was the case.

The complaint estimates, "upon information and belief", the number of physicians and patients enrolled in the ISAAC program but avers no facts with respect to 1) the identity of any physician who participated in the ISAAC program or was induced by the program to prescribe Paxil to a patient, 2) the identity of any patient who completed the telephonic survey or was prescribed Paxil upon successful completion, 3) any pharmacy or hospital that filled an induced Paxil prescription or 4) the approximate date, location, content or amount of any false claim submitted to any government health care program. Instead, Relator seeks to establish a connection between the alleged kickback scheme and the (unidentified) fraudulent claims by stating that "upon information and belief, most doctors in the ISAAC program became the top Paxil prescribers" and by offering conclusory assertions regarding ISAAC's success in increasing Paxil prescriptions. Relator has no direct knowledge that ISAAC participants prescribed Paxil or became Paxil's "top prescribers", and she has not specified when, following implementation of ISAAC, Paxil sales increased or why any such increase may reliably be attributed to the ISAAC program.

Relator's allegations do not satisfy the particularity
requirement. The exemplar for comparison is the <u>Duxbury</u> case in
which the First Circuit considered whether the particularity
requirement was satisfied by an inducement <u>qui</u> <u>tam</u> complaint
which 1) identified eight medical providers who allegedly
submitted false claims, 2) provided information with respect to
the dates and amounts of those claims and 3) identified the
government healthcare program to which the claims were submitted.
579 F.3d at 29-30. The court concluded that, although it was a
"close call", the complaint passed muster because it

> identified, as to each of the eight medical providers
> (the who), the illegal kickbacks (the what), the rough
> time periods and locations (the where and when), and the
> filing of the false claims themselves.

<u>Id.</u> at 30. By contrast, in <u>Rost</u>, the First Circuit held that the
particularity requirement was not satisfied by an inducement <u>qui</u>
<u>tam</u> complaint which did not identify "any false claim presented
by others to any government health program or any particular
entity or person who actually submitted such a claim." 507 F.3d
at 726, 732-33.

Relator's complaint here is akin to the complaint held
insufficient in <u>Rost</u>. It fails to provide any information
concerning 1) any ISAAC participant responsible for filing a
false claim or 2) any false claim that was submitted, including
the date or amount of any such claim or the government program to
which it was submitted. Furthermore, Relator has not offered

reliable statistical evidence to connect the ISAAC program to increased Paxil prescriptions.  In short, she has failed to state with the required particularity that the defendants caused false or fraudulent claims to be submitted to the government through illegal kickbacks.

### 2. Concealment of Adverse Events (Counts I, II and III)

Relator alleges that the defendants violated 31 U.S.C. § 3729(a)(1), (a)(2) and (a)(3) by concealing and failing to report approximately 7,000 adverse drug experiences reported to the Paxil 800 numbers.[1]  An adverse drug experience is "any adverse event associated with the use of a drug in a human, whether or not considered drug-related."  21 C.F.R. 314.80(a). Once the FDA approves a drug,

> the manufacturer remains under an obligation to investigate and report any adverse events associated with the drug and must periodically submit any new information that may affect the FDA's previous conclusions about the safety, effectiveness, or labeling of the drug.

Wyeth v. Levine, 555 U.S. 555, 608 (2009) (citation omitted).

Although the complaint posits several theories of liability under the FCA due to defendant's alleged failure to report adverse events, Relator, in her memoranda, has narrowed her legal theory to one "primary" and one "alternative" argument.

---

[1]  Relator contends Infomedics is liable only under subsections (a)(1) and (a)(3).

Relator characterizes her primary argument to be that, had
GSK in its new drug applications informed the FDA that it did not
intend to report adverse events, the FDA never would have
approved GSK's new or supplemental new drug applications
(including the supplemental applications for the following
indications: SAD (1999), Generalized Anxiety Disorder ("GAD")
(2001) and Post-Traumatic Stress Disorder ("PTSD") (2001)).
Relator contends that certifying compliance with the adverse
event reporting requirements is a mandatory condition precedent
to obtaining FDA approval and, without such certification, the
supplemental applications would not have been approved.  Thus,
Relator concludes, GSK's fraud in its supplemental drug
applications caused all subsequent Paxil reimbursement claims to
be false.

As an initial matter, the argument is dissipated by its
breadth.  Relator does not contend that all Paxil reimbursement
claims filed for SAD, GAD and PTSD are false but rather that all
Paxil claims filed with respect to any indication subsequent to
the submission of those supplemental drug applications are false.
Essentially, then, the argument is less about GSK's purported
fraud in its supplemental drug applications (which would
presumably render only those subsequent, indication-specific
claims false) and more about Relator's unsubstantiated belief

that the alleged 7,000 adverse reports would have evoked adverse action by the FDA.  For the reasons to be articulated, that argument is unavailing.

Even taking Relator's "fraud-on-the-FDA theory" at face value, she has failed to plead the alleged fraud with the requisite specificity.  The complaint provides none of the facts necessary to support her claim that GSK's representations to the FDA that it would comply with its adverse event monitoring and reporting obligations were false at the time they were made. First, the complaint does not include the date that any Paxil supplemental new drug application was submitted to the FDA for approval but only the date GSK obtained approval.  At the very least, it is clear that the SAD supplemental application would have been filed well before any adverse events were reported to the Paxil 800 numbers because those numbers were implemented by GSK's <u>post-approval</u> SAD marketing campaign.  Relator's argument is fallacious insofar as it presumes GSK's prior intent from its subsequent alleged reporting violations.

Second, the complaint does not include identify who within GSK made allegedly false statements to the FDA and/or who within GSK was involved in the alleged concealment scheme.  Nor does it provide information concerning any internal GSK procedures or policies on FDA submissions or the content of any actual GSK submission to or communication with the FDA.  The complaint is

thus devoid of allegations sufficient to establish that GSK knowingly caused a false statement to be made or used by the government.

b. <u>Relator's "alternative" argument</u>

Relator characterizes her alternative argument to be that, had GSK timely reported the adverse events received by Infomedics between 1999 and 2002, the FDA would have ordered GSK to issue suicide and enhanced birth defects warnings in more timely fashion and those warnings would have resulted in fewer Paxil sales and thus fewer claims for reimbursement. Relator declares that there is nothing "hypothetical" about her alternative argument insofar as the FDA issued enhanced suicide and birth defects warnings in 2003 and 2005, respectively, both of which caused Paxil sales, and reimbursement claims, to decline precipitously.

That argument fails because it presumes, without factual support, that submitting the 7,000 adverse reports would have hastened the FDA's decision to require warnings and that, had such warnings been implemented sooner, physicians would have prescribed Paxil less often between 1999 and 2002. First, the inference that warnings would have issued earlier is unsupportable in the absence of any evidence that information was available to the FDA at the time concerning Paxil's association with suicide and/or birth defects. As the government asserts,

-19-

the record in this case suggests that the FDA was, in fact, aware of the information Relator offers but did not then action to increase warnings or remove the drug from the market. Second, the inference that doctors would have prescribed the drug less frequently is also unsupportable absent any details of, _inter alia_, other treatment alternatives available at the time.

Finally, while Relator characterizes the alleged adverse reports as involving horrific accounts of suicide and birth defects linked to Paxil, she has provided not a single example of such a report or, more germanely, how or why a particular report would have affected the FDA's decision to require enhanced warnings in light of other information already available to the FDA.

In sum, Relator has neither connected the purported concealment scheme to a false reimbursement claim or a materially false statement, nor shown that the defendants intended to defraud the government. Her claims thus fail to satisfy Fed. R. Civ. P. 9(b) and defendants' motion to dismiss will be allowed. In light of the government's unopposed request, such dismissal will be without prejudice to the government.

**ORDER**

In accordance with the foregoing, Glaxosmithkline PLC and Glaxosmithkline LLC's Motion to Dismiss Relator's Amended Complaint With Prejudice (Docket No. 50) and Infomedics, Inc.'s

-20-

Motion to Dismiss First Amended Complaint With Prejudice (Docket

No. 53) is **ALLOWED** without prejudice to the government.

**So ordered.**

                              /s/ Nathaniel M. Gorton
                              Nathaniel M. Gorton
                              United States District Judge

Dated March 12, 2012